UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
TROY WRIGHT,                        :
                                    :           Pro Se
                  Plaintiff,        :
                                    :    06 Civ. 03400 (RJS) (THK)
      -against-                     :
                                    :    **REPORT AND RECOMMENDATION**
NEW YORK STATE DEPARTMENT OF        :
CORRECTIONAL SERVICES, et al.;      :
                                    :
                  Defendants.       :
-------------------------------X

**TO: HON. RICHARD J. SULLIVAN, UNITED STATES DISTRICT JUDGE.**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff Troy Wright, an inmate at Green Haven Correctional Facility ("Green Haven"), brings this civil rights action pro se, pursuant to 42 U.S.C. § 1983. He asserts two Eighth Amendment claims against New York State Department of Correctional Services ("DOCS") officials and doctors. First, he alleges that Defendants exposed him to the bacteria Heliobacter pylori, known as H. pylori, through the central water supply at Green Haven. Second, he claims that Defendants failed to provide him with adequate medical care for his infection with H. pylori, and for maladies the infection allegedly caused.

The case was referred to this Court for general pretrial supervision and Reports and Recommendations on dispositive motions, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). Presently before the Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Motion"). For the reasons set forth below, the Court recommends that the

1

COPIES MAILED
TO COUNSEL OF RECORD ON 10/17/08

Motion be granted.

**BACKGROUND**

Unless otherwise noted, the following facts are undisputed.[1]

I.  The Parties' Allegations

Plaintiff has been incarcerated at Green Haven since 1995. (See Defendants' Statement of Undisputed Material Facts, submitted pursuant to Local Civil Rule 56.1 ("Defs.' 56.1"), ¶ 9.) He alleges that the Green Haven water supply is contaminated with "sewage [b]acteria" and the parasite Giardia lamblia ("Giardia").[2] (See Order to Show Cause and Complaint Pursuant to 42 U.S.C. § 1983, filed March 24, 2006 ("Compl."), ¶ 9; Exhibit ("Ex.") F Annexed to the Declaration of Stephen N. Schulman, dated May 15,

---

[1] Plaintiff has not complied with Local Rule 56.1 for the Southern District of New York. Under the Rule, a party opposing summary judgment must submit a statement of proposed facts with numbered paragraphs that correspond to each paragraph in the moving party's factual statement. See S.D.N.Y. Civ. R. 56.1 (2008). Because Plaintiff did not do so, each contention in Defendants' 56.1 statement is "deemed to be admitted" against him to the extent it is supported by competent evidence. See id. However, in light of the obligation to read pro se submissions liberally, see Hughes v. Rowe, 449 U.S. 5, 9, 101 S. Ct. 173, 176 (1980), the Court has taken into account the evidentiary submissions attached as exhibits to Plaintiff's Opposition to the Motion.

[2] The Complaint refers to "sewage bacteria," but not specifically to the parasite Giardia, which may spread through water contaminated with fecal matter. See infra Part II-A. However, Plaintiff does discuss Giardia in a grievance he filed at Green Haven in 2005. (See Schulman Decl. Ex. F at 448.) Reading Plaintiff's submissions leniently, the Court recognizes allegations about Giardia — which the Motion addresses — in evaluating whether Defendants are entitled to summary judgment.

2

2008 ("Schulman Decl."), at 448.) Drinking the water caused him to become infected with H. pylori, he asserts, which in turn gave him chronic acid reflux disease. (See Compl. ¶¶ 10, 13; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed June 12, 2006 ("Pl.'s Mem."), at 12.) Plaintiff claims the infection has also exposed him to the risk of stomach cancer. (See Compl. ¶ 13.)

Plaintiff filed his Complaint on March 24, 2006, naming as defendants DOCS; Glenn S. Goord ("Goord"), the DOCS Commissioner until 2006 (see Defs.' 56.1 ¶ 3); William E. Phillips ("Phillips"), Superintendent of Green Haven from 2002 to 2005 (see id. ¶ 4); Gayle Haponik ("Haponik"), Deputy Superintendent of Green Haven at relevant times during Plaintiff's incarceration (see id. ¶ 5); Dr. Carl J. Koenigsmann, Facility Health Services Director for Green Haven, until 2003 (see id. ¶ 6); Dr. Hari Chakravorty, Plaintiff's physician at Green Haven since 1999 (see id. ¶ 7; Declaration of Dr. Hari Chakravorty, dated May 13, 2008 ("Chakravorty Decl."), ¶ 11); Dr. Lester Wright, Chief Medical Officer for DOCS (see Defs.' 56.1 ¶ 8); and Jean Ann McGrane ("McGrane") of the New York State Department of Environmental Conservation ("DEC") (see Schulman Decl. Ex. F at 445).[3] Defendants, according to Plaintiff, knew

___

[3] On April 5, 2007, at Plaintiff's request, the Court removed named Defendant Erin Crotty of the New York State Department of Health as a misjoined party. By order dated October 23, 2007, the Court dismissed Plaintiff's claims against another named Defendant, Louis-Jack Pozner, for lack of subject matter

3

that Green Haven's drinking water was unsanitary, and were aware of multiple complaints about it, yet did not take corrective measures. (See Compl. ¶¶ 10-12, 14.) In this way, he argues, they showed deliberate indifference to the risk that he would become infected with H. pylori. (See id. ¶¶ 9-12.)

Plaintiff also claims that Defendants were deliberately indifferent to his serious medical needs. (See id. ¶¶ 6, 12-14.) He makes two basic allegations. First, due to a lack of "proper investigation or testing," his medical providers failed to timely diagnose and treat his infection with H. pylori. (See Pl.'s Mem. at 18.) Second, they inadequately diagnosed and treated his digestive maladies, and failed to offer "other treatment options" that would be "effective." (See id. at 20.)

To redress Defendants' wrongdoing, Plaintiff seeks injunctive relief in the form of "modif[ication]" of the water system at Green Haven, as well as damages.

On May 16, 2008, Defendants Goord, Phillips, Haponik, Koenigsmann, Chakravorty, and Wright filed the instant Motion. In it, they argue that the "material facts are undisputed that [P]laintiff's medical condition is not serious, that [D]efendants took proper care in ensuring the safety of the water supply[,] and that any ailment [P]laintiff had was properly treated." (See Defendants' Memorandum of Law in Support of Motion for Summary

---

jurisdiction.

4

Judgment, filed May 16, 2008 ("Defs.' Mem."), at 1.) Thus, they
assert they are entitled to summary judgment. (See id.)

## II. Facts Related to Plaintiff's Contaminated Water Exposure Claims

### A. H. Pylori And Giardia

As background information, the parties submit evidence about
H. pylori and Giardia, the alleged contaminants in Green Haven's
water. H. pylori are bacteria that are able to grow in the human
stomach. (See Chakravorty Decl. ¶ 6.; Pl.'s Mem. Ex. 27 at 1.)
Infection with H. pylori affects a "substantial percentage" of the
population. (Chakravorty Decl. ¶ 7.) According to a printout from
medicinenet.com, appended to Plaintiff's opposition and cited in
Defendants' reply brief, approximately 30% of the adult population
in the United States is infected. (See Pl.'s Mem. Ex. 26;
Defendants' Reply Memorandum of Law in Further Support of Motion
for Summary Judgment, filed August 7, 2008 ("Defs.' Reply"), at 3.)

Some individuals infected with H. pylori do not experience any
symptoms. (See Chakravorty Decl. ¶ 7.) Where symptoms occur, they
are similar to those associated with digestive disorders, such as
gastroesophogeal reflux disease ("GERD"), commonly known as acid
reflux. (See id.) Nevertheless, H. pylori has been linked to
"more serious" conditions such as gastrointestinal ulcers. (See
id. ¶ 7.) Among patients who have developed ulcers, H. pylori
"rarely" may lead to stomach cancer. (See id.)

H. pylori spreads "through contaminated food and water,"

5

according to an article from the National Cancer Institute, submitted by Plaintiff. (See Pl.'s Mem. Ex. 27 at 2.) Defendants concede that it may be "possible to contract H. pylori . . . through contaminated water." (Chakravorty Decl. ¶ 6.) However, "the mechanism of exposure is not well understood by the scientific community and there may be many ways to contract it." (Id.) The prevalence of H. pylori in the general population makes it difficult to "identify the source of exposure" in infected patients, who may "not . . . be diagnosed for a substantial time, sometimes years." (Id. ¶ 34.)

Giardia is a single-celled parasite that may be spread through water contaminated with human or animal fecal matter. (See id. ¶ 9.)

## C.   The Water Supply at Green Haven

### 1.   Drinking Water Sources and Treatment

Defendants submit an affidavit from Frank Weger ("Weger"), who holds the DOCS classification Plant Utilities Engineer IV and oversees the drinking and waste water treatment plants at Green Haven. (See Declaration of Frank Weger, dated May 16, 2008 ("Weger Decl."), ¶ 1.) Weger explains that, prior to 2001, the source for drinking water at the prison was a reservoir located approximately five miles away. (See Weger Decl. ¶ 4.) Raw water from the reservoir traveled to a treatment plant for sand filtering and chlorination, and was then piped into the prison. (See id. ¶ 5.)

6

The reservoir was situated "upstream in the watershed from the . . . wastewater treatment plant" used by Green Haven. (Id. ¶ 4.)

In April 2001, Green Haven switched to a well water system, which remains in use today. (See id. ¶ 4.) The facility draws raw water from three wells less than one mile away, also located "upstream from the waste water treatment plant." (Id.) The water is routed to a treatment plant for sand filtering, chlorination, and the addition of softeners, before being piped into the facility. (See id. ¶ 5.)

According to Weger, chlorination kills bacteria. (See id. ¶ 11.) "As H. pylori is a [type of] bacteria," Weger reasons, "chlorination should kill it." (Id.) Giardia, on the other hand, "is not eliminated by chlorination." (Id. ¶ 16.) Weger asserts that the "presence of beavers" poses the "most significant risk of exposure to Giardia." (Id.) That risk "was successfully controlled" when the reservoir was in operation, Weger contends, and currently does not pose a threat "because the source of the well water is underground." (Id.) "The risk of Giardia leaching into the wells from surface water is currently low," Weger claims. (Id.)

2. Testing for Coliform Bacteria

Evidence provided by Defendants shows that Green Haven tests its drinking water for the presence of contaminants, including Coliform bacteria. (See Weger Decl. ¶ 6 & Ex. A.) These are

7

another type of bacteria that "originate[] in the intestines of animals." (See Weger Decl. ¶ 6.) Testing for coliform bacteria, according to Weger, is regarded as both "a good indicator of the presence [or] absence of biological contaminants," and "an acceptable indicator of . . . the sanitary condition" of drinking water. (Weger Decl. ¶ 6.) To Weger's knowledge, there is no specific legal requirement to test for H. pylori or Giardia,[4] and no standard industry practice of doing so. (See Weger Decl. ¶ 6.)

To perform coliform testing, Green Haven uses a private contractor, which takes three water samples a month. (See id. ¶ 8.) The batch includes one sample from raw, pre-treatment water, and two from the treated water available to inmates and staff inside the facility. (See id. ¶ 8.) Defendants have provided testing records for 2003. (See Weger Decl. Ex. A.) Results for every sample of treated water taken from inside Green Haven in 2003 list coliform bacteria as "absent." (See id.) Results for every raw water sample taken during that year show "no more than trace

---

[4] Although research appears to confirm this is true, neither party cites authority about sanitary standards for water. New York law does closely regulate the permissible level of coliform bacteria in drinking water, and mandates testing to assure compliance with that standard. See N.Y. ENVTL. CONSERV. LAW § 17-0301 (McKinney 2008) (establishing maximum acceptable levels of coliform bacteria for drinking water); N.Y. COMP. CODES R. & REGS tit. 6, § 70.34 (2008) (providing for determination of compliance with maximum coliform levels by "examinations"). The state also imposes record keeping and reporting duties on public water system operators. See N.Y. COMP. CODES R. & REGS tit. 10, §§ 5-172-73.

8

levels of coliform within satisfactory limits." (Weger Decl. ¶ 9 & Ex. A.)

Weger states that coliform tests "from 2002 to present . . . show results consistent with the 2003 reports." (Weger Decl. ¶ 9.) In support of this assertion, Weger cites "water systems operation reports" that engineers at Green Haven must submit to the New York State Department of Health ("DOH") each month, utilizing a standard form. (See Weger Decl. Ex. B.) The reports incorporate data from coliform test results. (See Weger Decl. ¶ 10.) One of the questions on the report form asks whether an "MCL violation" exists. (See Weger Decl. Ex. B.) This refers to the "maximum contaminant level" allowed in drinking water for substances such as coliform bacteria. See N.Y. COMP. CODES R. & REGS. tit. 6, § 700.1 (2008) (defining "Specific MCL" as a "maximum contaminant level" for specific substances). For each month from January 2002 to September 2007, the reports state that there was no "MCL violation." (See Weger Decl. Ex. B.) In other words, the reports for that time period show acceptable levels of coliform bacteria in Green Haven's water. (See Weger Decl. ¶ 9.)

3. The Risk of Contamination of Green Haven's Water

Plaintiff offers a variety of records from Green Haven to substantiate his claim that the water is contaminated. He relies most heavily on technical information about the well system currently in operation. Some of this is included in Green Haven's

9

"Annual Water Quality Report" for 2003 (the "2003 AWQR"), which is published by DOCS and made available in the inmate library at the prison. (See Defs.' 56.1 ¶ 30.) The 2003 AWQR states that the Green Haven water source has "an elevated susceptibility to microbials, nitrates, industrial solvents and other industrial contaminants." (See Pl.'s Mem. Ex. 21.) The reason is the "close proximity" of Green Haven's wells to "permitted discharge facilities (industrial/commercial facilities that discharge wastewater into the environment and are regulated by the state and/or federal government)," and nearby "industrial activity." (Id.) The report notes that "the susceptibility rating is an estimate of the potential for contamination," but "does not mean that the water delivered to consumers is, or will become contaminated." (Id.)

Plaintiff also cites an August 2003 evaluation of Green Haven's wells performed by Earth Tech Northeast, Inc. ("Earth Tech"), an engineering firm, for the New York State Office of General Services ("OGS"). (See Pl.'s Mem. Ex. 22. at 1.) OGS asked Earth Tech to assess whether the ground water in the wells was vulnerable to infiltration by surface water. (See id. at 1.) In April 2004, Earth Tech submitted a preliminary report concluding that "the wells at . . . Green Haven must be considered suspect" for the presence of surface water. (Id. at 9.) The report recommended additional testing to make a definitive determination.

10

(See id.) In July, 2004, Earth Tech submitted a proposal for further analysis. (See Pl.'s Mem. Ex. 23 at 1.)

Addressing the Earth Tech evaluation, Weger admits that "[t]esting . . . confirmed an influence of surface water on the well water at Green Haven." (See Weger Decl. ¶ 15.) Nevertheless, in his opinion, the "influence" does not create a risk of contamination with bacteria or parasites:

The surface water influence does not cause a substantial risk of bacterial contaminants. . . . [T]he surface water . . . is not sufficiently close to areas where farm animals or fertilizer are present to result in a substantial risk of a biological contaminant. Green Haven has been requested to install fiber filtering to its drinking water treatment plant. This project is expected to be completed by 2009 and the Department of Health has not informed Green Haven that the project is of an emergency nature. The filtering is designed to screen out particulate matter, not bacterial contaminants.

(Id.)

Correspondence submitted by the parties reflects two incidents pertinent to Plaintiff's allegations that the water facilities at Green Haven are not safe. (See Compl. ¶ 14.) First, in July, 1993, McGrane of the DEC wrote to a Green Haven prisoner named Kelly Green ("Green"). (See Schulman Decl. Ex. F at 445.) Her letter stated that Green Haven "was recently cited . . . for the illegal discharge of sewage from an overflowing sewer line." (Id.) "In addition," McGrane wrote, "New York State Corrections paid a penalty of $10,000 for past violations at the [Green Haven] sewage treatment plant and was required to rebuild the plant." (Id.) The

11

letter did not state that the waste water discharges or past violations had any effect on drinking water. Weger argues that the leaks referred to in the letter "would not have affected Green Haven's drinking water, the source of which was several miles upstream" from the sewage plant. (Weger Decl. ¶ 12.)

Second, in August, 2001, Weger sent a letter to the DEC to follow up on an incident in which "grayish water that had a sewage type odor to it" leaked onto adjoining property from Green Haven's storm water discharge. (Weger Decl. Ex. D.) The letter reported that Green Haven engineers discovered a missing plug on a dishwasher drain line. (See id.) This caused water from the dishwashers to "[run] off through the storm sewers" onto a neighboring farm. (Weger Decl. ¶ 13.) In Weger's opinion, "it is theoretically possible that some of the discharged water may have leached into Green Haven's drinking water supply." (Weger Decl. ¶ 13.) However, he concludes that "the chance of this was small and the risk of any such leaching having an adverse impact on the quality of the drinking water supply was even more remote." (Id.)

The record also includes letters regarding inmate complaints about Green Haven's drinking water. In August, 1997 an inmate wrote to McGrane to report that "the water . . . comes out with a stench of rot and so dark, that we have been at times unable to drink" it. (See Schulman Decl. Ex. F at 446.) Plaintiff wrote to McGrane in October 2003, claiming that other prisoners had been

12

diagnosed with H. pylori and Giardia infections. (See Schulman Decl. Ex. F at 448.) The cause of the infections, according to Plaintiff's letter, was a "[c]ontaminated . . . [w]ater [s]upply" resulting from the sewage discharge described in McGrane's letter from 1993. (Id. at 448.)

Plaintiff renewed this charge in a formal grievance filed at Green Haven in July 2005, alleging that the water was contaminated with "[s]ewage [b]acteria." (See Schulman Decl. Ex. F. at 442, 444.) He attached to the grievance file both letters to McGrane (see id. at 446-48), the July, 1993 letter from McGrane to Green (see id. at 445), the 2003 Water Quality report for Green Haven (see id. at 449), and two articles about H. pylori from the internet (see id. at 451-52). One quotes a medical professor as stating, "Water looks to be a major factor in the transmission of the bacterium." (See id. at 451.) The second asserts that "H. pylori infection is most likely acquired by ingesting contaminated food and water and through person to person contact." (See id. at 452.) As acting superintendent, Haponik signed a denial of Plaintiff's grievance on August 10, 2005. (See id. at 437; Def's 56.1 ¶ 56.)

The DOH has addressed a number of inmate complaints about Green Haven's water. Defendants cite letters to the New York State Commission of Corrections ("COC") from Michael Burke ("Burke"), Director of the Bureau of Public Water Supply Protection for the

13

DOH. (See Schulman Decl. Exs. G-H.) One, from November, 1998, concerned "complain[ts] of 'brown water[,'] 'stomach cramps' and 'skin discoloration' from the drinking water" at Green Haven. (See Schulman Decl. Ex. G at 498.) Burke wrote that his staff regularly reviews the monthly water operations reports described above, and responded to the complaints as follows:

> While fluctuating turbidities (measurements of water clarity) have been experienced periodically in the past, during the summer of 1998, the drinking water filtration plant at [Green Haven] consistently met the filter performance standard for turbidity. Also, routine bacteriological monitoring (3 samples per month) by a commercial laboratory has consistently shown the water to be of satisfactory sanitary quality.

(Id.) An August 19, 1999 letter from Burke addressed reports that the water had "unusual . . . taste [and] smell," and was a "possible source of illness." (See Schulman Decl. Ex. G at 501.) Citing water systems reports to the DOH for 1999, Burke acknowledged some "fluctuation in turbidity." (Id.) He nevertheless maintained that bacteriological testing had "consistently shown the water to be of satisfactory sanitary quality." (Id.)

In a February 2004 letter, Burke reached similar conclusions about Plaintiff's October, 2003 complaints to McGrane. (See Schulman Decl. Ex. H at 2.) According to Burke, the wells at Green Haven create "sufficient natural filtration" to protect against Giardia contamination. (Id.) He conceded that "H. pylori . . . [contamination] is harder to disprove, since this bacteria is

14

commonly found in most populations." (Id.) However, Burke again asserted that Green Haven water has a "good history of bacteriological sampling results." (Id.) In August 2004, Burke responded to complaints of discoloration, odor, and an "oil" residue. (See Schulman Decl. Ex. H at 4.) He reiterated that test results show the water is "of a satisfactory quality at the time of sampling." (Id.)

## III. Care for Plaintiff's Medical Conditions

### A.    GERD Diagnosis and Treatment

Plaintiff contends that his digestive problems began after he arrived at Green Haven, between 1995 and 1997. (See Defs.' 56.1 ¶ 31; Wright Dep. 70-72.) At the time of his medical screening, shortly after he came to the facility, he was not under treatment for any digestive tract conditions. (See Chakravorty Decl. ¶ 10; Plaintiff's Medical Records Submitted in Conjunction With Defendants' Motion for Summary Judgment ("Med."), at 247.) Dr. Chakravorty became Plaintiff's doctor in 1999. (See Chakravorty Decl. ¶ 11.)

Prior to 2002, Plaintiff "received Maalox occasionally for complaints of heartburn." (Chakravorty Decl. ¶ 13; See Med. at 235-42, 298, 301, 304, 373.) He began to experience regurgitation of food in 2002, and complained of this symptom on May 14, 2002. (See Wright Dep. 81-82; Med. at 235.) At that time, Chakravorty

15

states, he "considered the need to rule out gastroesophogeal reflux disease," or GERD. (Chakravorty Decl. ¶ 14.)

On June 4, 2002, Plaintiff saw a gastrointestinal ("GI") specialist "[o]n [Chakravorty's] request." (See id. ¶ 15.) Plaintiff complained of "severe heartburn" to the specialist, who diagnosed Plaintiff with GERD. (See Med. at 98; Chakravorty Decl. ¶ 15.) The specialist recommended a gastroduodenoscopy ("EGD") and the prescription of the antacid Prevacid. (See Chakravorty Decl. ¶ 15.)

On August 19, 2002, Plaintiff wrote to Koenigsmann to complain of "choking" and "[s]erious [h]eartburn," and that his medication "had no [e]ffect." (Pl.'s Mem. Ex. 6.) He requested that his visit to the GI clinic for the EGD be scheduled "sooner [rather] than later." (See id.) Koenigsmann responded by letter on September 5. He wrote that the "procedure is scheduled and will be performed soon." (See Pl.'s Mem. Ex. 6.)

On September 10, 2002, Plaintiff went to St. Agnes Hospital to undergo the EGD procedure. (See Defs.' 56.1 ¶ 42; Chakravorty Decl. ¶ 16.) It revealed "a 'small' hiatal hernia and 'mild' gastritis," but the results were "otherwise normal." (Med. at 95; see Chakravorty Decl. ¶ 16.) The GI specialist prescribed Prevacid for Plaintiff, at 30 milligrams per day, and recommended a follow-up visit to the GI clinic in three months. (See Med. at 95-96; Chakravorty Decl. ¶ 16.) After the visit, according to Plaintiff,

16

Chakravorty "only prescribe[d]" 15 milligrams of Prevacid for him. (See Pl.'s Mem. at 19.)

Plaintiff wrote a letter to Koenigsmann on October 9, 2002, complaining that his symptoms had not been adequately treated. (See Pl.'s Mem. Ex. 9.) He reported "regurgitating [f]ood . . . [h]eart burn and [e]xtreme [h]alitosis." (Id.) He had been improperly diagnosed with "simple [a]cid reflux," he claimed. (Id.) What he actually suffered from, he worried, was "Pharyngeal Diverticula." (Id.) Patients with this disorder, according to a passage from a medical book described in the letter, develop pockets in the digestive tract where food may become trapped. (See id.) Plaintiff's research on this condition caused him to fear aspirating food and "chok[ing] to death," as well as lung hemorrhaging. (See id.)

On October 22, 2002, Plaintiff complained to a nurse about acid reflux. (See Med. at 226.) On October 28, 2002, Chakravorty saw Plaintiff and "increased the dosage of Prevacid" to 30 milligrams. (Chakravorty Decl. ¶ 17; see Med. at 225.) In his health record for that day, Plaintiff wrote "I Troy Wright fully understand the risk of taking 30 mg. Prevacid on a continuing basis and I'm requesting 30 mg. Prevacid daily," below which he wrote his name and the date. (Med. at 226.) Nevertheless, Plaintiff asserts that "no side effects [were] discussed" regarding the increased dosage at that time. (Pl.'s Mem. at 20.)

17

On March 25, 2003, Plaintiff filed a grievance to protest treatment of his digestive conditions. (See Pl.'s Mem. Ex. 10; Schulman Decl. Ex. E at 416.) He stated that he had been "[m]isdiagnosed" and that medical providers had "under estimated [sic] . . . this problem." (Schulman Decl. Ex. E at 416.) He requested testing for pharyngeal diverticula, and surgery if it would be an "effective remedy." (Id.) The grievance was denied on May 6, 2003. (See id. at 414, 417.)

B.    H. Pylori Diagnosis & Treatment

On March 27, 2003, Plaintiff again complained to Chakravorty of "acid in [his] stomach" and "[h]eartburn." (Med. at 220.) Chakravorty "ordered testing for H. pylori," and Plaintiff tested positive for the bacteria on April 7. (See Med. at 128; Chakravorty Decl. ¶¶ 18-19.) On April 8, Chakravorty prescribed the antibiotics Amoxycillin and Biaxin, and again prescribed Prevacid. (See Med. at 219; Chakravorty Decl. ¶ 19.)

When Plaintiff reported continuing GERD symptoms on May 20, 2003, Chakravorty ordered another H. pylori test. (See Chakravorty Decl. ¶ 20.) Based on a sample taken on May 23, Plaintiff tested negative for H. pylori. (See Med. at 126.) On May 27, Plaintiff visited the GI clinic. (See Med. at 89.) The GI specialist recommended a dual medication regimen of Prevacid in the morning and Pepcid, a different antacid, in the afternoon. (See Chakravorty Decl. ¶ 21.) The specialist also recommended that

18

Plaintiff return in four months. (See Med. at 89.) Koenigsman modified this recommendation to provide for follow up visits "prn," meaning "as needed." (See id.; Chakravorty Decl. ¶ 21.)

C.   Testing and Additional GERD Treatment

After complaints of abdominal pain, Plaintiff underwent abdominal x-rays on December 29, 2003. (See Med. at 72; Chakravorty Decl. ¶ 22.) The x-ray report stated that there was "NO ABNORMALITY IDENTIFIED." (Med. at 72.)

On February 9, 2005, "after a period of relatively few complaints about reflux," Plaintiff complained of heartburn to Chakravorty. (Chakravorty Decl. ¶ 26.) Chakravorty "prescribed antacids and advised plaintiff to lose weight, consider a low salt diet, exercise and return in two months." (Id.)

Plaintiff "requested cancellation of a specialist referral, including GI series x-rays," on February 16, 2005. (Id. ¶ 27; see Med. at 171.) However, when he reported "that medication was not helping his heartburn," on August 16, 2005, "the x-rays . . . were reordered." (Chakravorty Decl. ¶ 29.) On September 7, 2005, Plaintiff received an upper GI x-ray series at Mount Vernon Hospital. (See Med. at 69.) The report concluded as follows:

Examination of the esophagus demonstrates normal peristalsis with no evidence of stricture, neoplasm, hiatus hernia or reflux.

Examination of the stomach demonstrates normal mucosal folds with no evidence of ulceration or neoplasm. The duodenal bulb distends well with no evidence of peptic

19

ulcer disease. The duodenal sweep and the remainder of
the visualized small bowel are unremarkable.

(Id.)

Plaintiff's July 13, 2005 grievance complained of inadequate
treatment for acid reflux disease. (See Schulman Decl. Ex. F. at
442-44.) He also claimed that Chakravorty failed to make a timely
diagnosis of his H. pylori infection, allowing the bacteria to
remain in his digestive system "over a period of 8 [years]." (See
id. at 443.)

On March 1, 2007, Plaintiff again tested negative for H.
pylori. (See Med. at 111.)

According to Chakravorty, Plaintiff suffers from "chronic but
mild acid reflux disease or GERD." (Chakravorty Decl. ¶ 34.) The
"cause" of this condition, Chakravorty contends, "cannot be
identified." (Id. ¶ 34.) Although Plaintiff continues to complain
about heartburn and acid reflux "on occasion" (see id. ¶ 33), his
condition "appears to be managed with medication," according to
Chakravorty (id. ¶ 34). The record shows periods without
documented complaints of acid reflux from Plaintiff, such as
November 2002 to March 2003 (see Med. at 221-25), and June 2003 to
February 2004 (see id. 204-16). Surgery for Plaintiff's condition
"is not . . . a viable option" because he currently has no
"condition subject to surgical repair." (Chakravorty Decl. ¶ 33.)

# DISCUSSION

## I.  Summary Judgment Standards

Under Rule 56(c)of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless a court determines that there is no genuine issue of material fact to be tried, and that the moving party is entitled, as a matter of law, to summary judgment in its favor.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 98-99 (2d Cir. 2003).  The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment.  See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  Once a properly supported motion for summary judgment has been submitted, the burden shifts to the non-moving party to make a sufficient showing to establish the essential elements of the claims on which it bears the burden of proof at trial.  See Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003); Peck v. Pub. Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553).

In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary

21

judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006). However, the non-moving party must put forth "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial. See Anderson, 477 U.S. at 256-57, 106 S. Ct. at 2514; Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007). Affidavits supporting or opposing the motion must be based "on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1); see also Amnesty America v. Town of West Hartford, 361 F.3d 113, 131 n.12 (2d Cir. 2004) (stating that the district court was "free to disregard" evidence that would be "inadmissible at trial" under Rule 56). However, if a plaintiff is proceeding pro se, courts are to construe the pleadings liberally. See, e.g., Williams v. Edwards, 195 F.3d 95, 96 (2d Cir. 1999) (per curiam).

Ultimately, "[a] dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'" Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 254 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 248, 106 S. Ct. at 2510).

II. Standards for Inadequate Conditions of Confinement

In order to sustain a claim that conditions of confinement violate the Eighth Amendment, a prisoner must meet an objective and a subjective standard. First, the conditions, when viewed objectively, must be serious enough to "deprive [a prisoner] of the minimal civilized measure of life's necessities." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399 (1981); see also Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991)). Exposure to unsafe levels of toxic substances, such as tobacco smoke or asbestos, may suffice as sufficiently dangerous conditions to satisfy the objective element of an Eighth Amendment claim. See Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 2481-82 (1993) (holding that allegations of deliberate indifference to plaintiff's exposure to tobacco smoke stated a cause of action under the Eighth Amendment); LaBounty v. Coughlin, 137 F.3d 68, 72 (2d Cir. 1998) (finding that deliberate indifference to friable asbestos exposure also "stated an Eighth Amendment claim").

Second, "the charged official must act with a sufficiently culpable state of mind." Salahuddin, 467 F.3d at 280. If the officials involved acted with "'deliberate indifference' to the

inmates' health or safety," they may be culpable. Hope v. Pelzer, 536 U.S. 730, 738, 122 S. Ct. 2508, 2514 (2002) (citing Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995 (1992)); see also Wilson, 501 U.S. at 298, 111 S. Ct. at 2324. The standard for deliberate indifference is equivalent to that of criminal recklessness. See Hernandez v. Keane, 341 F.3d 137, 144 (2d. Cir. 2003). Thus, it "entails something more than mere negligence," but less than "acts or omissions for the very purpose of causing harm." Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 1978 (1994). For instance, where a plaintiff alleges exposure to toxic materials, he can prevail by showing "that the defendants knew of the health dangers and yet refused to remedy the situation." LaBounty, 137 F.3d at 73.

III. Application to Plaintiff's Contaminated Water Claims

For purposes of analysis, the Court is prepared to accept that regular exposure to H. pylori and Giardia in Green Haven drinking water over a number of years would be serious enough to "deprive" inmates of the "necessity" of potable water. See Rhodes, 452 U.S. at 347, 101 S. Ct. at 2399. Accordingly, the Court assumes that, if proven, such exposure would satisfy the objective standard of an Eighth Amendment claim. The problem for Plaintiff is that he lacks competent evidence from which a reasonable jury could find that the alleged contamination ever occurred. The record thus provides no

24

issue of fact as to the objective element of Plaintiff's contaminated water claim.

Evidence on the subjective element also falls short. The record shows that Green Haven officials took reasonable measures to keep the drinking water safe. Plaintiff has provided no evidence that anyone at the prison "knew of . . . yet refused to remedy" the risk of H. pylori or Giardia in drinking water. See LaBounty, 137 F.3d at 73. For those reasons, there can also be no issue of fact as to deliberate indifference to contaminated water on the part of any Defendant.

Drinking water at Green Haven satisfies sanitary requirements, according to evidence offered by Defendants. Each monthly report from the engineering department to the DOH, from January 2002 to December 2007, states that coliform bacteria are "absen[t]" from treated water. (See Weger Decl. ¶ 10 & Ex. B.) Sampling records also show treated water at Green Haven tested negative for coliform bacteria during each month in 2003. (See Weger Decl. Ex. A.) Plaintiff does not dispute that, as asserted by Weger, testing for coliform bacteria is "a good indicator of the presence [or] absence of biological contaminants" (Weger Decl. ¶ 6), and "an acceptable indicator of . . . the sanitary condition" of drinking water (id.).

Moreover, the letters from Burke of the DOH indicate that the agency monitoring compliance with sanitary regulations approved of Green Haven's water. Over a time period spanning use of both the

25

old reservoir and the current wells, Burke repeatedly proclaimed that the water met sanitary requirements. (See Schulman Decl. Exs. G-H.) He wrote that the water "consistently met the filter performance standard" for clarity (Schulman Decl. Ex. G at 498); that he had "consistently" found it to "meet quality requirements" (id. at 501); that it had a "good history of bacteriological sampling" (Schulman Decl. Ex. H at 2); and that it was "of a satisfactory quality at the time of sampling" (id. at 4). Such statements from an official at the DOH serve as evidence that the engineering department was not even negligent, let alone deliberately indifferent to contamination by bacteria or parasites.[5] See Davidson v. Scully, 155 F. Supp. 2d 77, 82 (S.D.N.Y. 2001) (noting that deliberate indifference "entails something more than mere negligence" and granting summary judgment against plaintiff on an Eighth Amendment claim) (quoting Farmer, 511 U.S. at 835, 114 S. Ct. at 1978).

---

[5] Plaintiff does not object to the letters as hearsay. Facially, the letters show they were written by a public official "in response to" complaints about the water from inmates. (See, e.g., Schulman Decl. Ex. G at 498.) Thus, the letters are arguably admissible as public records setting forth "factual findings resulting from an investigation made pursuant to authority granted by law." Fed. R. Evid. 803(8). The letters are also arguably admissible to show the state of mind of anyone involved with the water supply at Green Haven. See United States v. Ansaldi, 372 F.3d 118, 130 (2d Cir. 2004) (holding a document admissible for the purpose of showing the defendant's state of mind, citing the hearsay standard from Fed. R. Evid. 801(c), although the defendant objected that he had not authored the document and had never read it).

In the face of this evidence, Plaintiff raises only "conjecture [and] speculation" about the presence of bacteria or parasites in Green Haven's water. Stevens v. Goord, 535 F. Supp. 2d 373, 383 (S.D.N.Y. 2008) (evaluating Eighth Amendment claims on summary judgment) (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)). To substantiate his allegations, Plaintiff devotes most of his efforts to arguing that the well system implemented in 2001 is not adequately protected from contamination.

(See Pl.'s Mem. at 3-6.) Yet, the fact that he tested negative for H. pylori in March 2007, long after his antibiotic treatment upon being diagnosed in 2003, undermines the theory that drinking water originating from the wells caused his infection. (See Med. at 111; Chakravorty Decl. ¶¶ 19-20.) It also makes it unlikely that the water continues to pose any hazard.

Furthermore, Plaintiff misinterprets the 2003 AWQR and the 2004 Earth Tech reports. (See Pl.'s Mem. at 3.) He focuses on statements from the 2003 AWQR about the "elevated susceptibility" of Green Haven's wells to "microbials," which are defined as "viruses and bacteria, which may come from sewage treatment plants [or] septic systems." (Pl.'s Mem. Exs. 20-21.) As Defendants point out in their reply brief, Plaintiff overlooks a key distinction. (See Defs.' Reply at 2.) The "susceptibility" assessment applies to the untreated "source water," not the final treated water accessible inside the facility. (See Pl.'s Mem. Ex.

27

21.) According to the report, "[t]he susceptibility rating . . . does not mean that the water delivered to consumers is, or will become, contaminated." (Id.)

As for the April, 2004 Earth Tech report, Plaintiff asserts that it "deemed all 3 Green Haven wells unfit for the production of drinking water." (Pl.'s Mem. at 6.) The conclusion Earth Tech actually reached was that "the wells at . . . Green Haven . . . must be considered suspect" for the "influence" of surface water. (Pl.'s Mem. Ex. 22 at 9.) The study results pertained to the source water from the wells, not the final treated water available to inmates. (See id. at 1 ("The purpose of [the study] was . . . to determine if . . . the water supply wells at . . . Green Haven . . . would or would not be classified as Groundwater Under Direct Influence (GWUDI) of surface waters . . . .").) Leaving aside Weger's position that the "influence" described in the report causes no "substantial risk of . . . a biological contaminant" in the pre-treatment source water, Plaintiff misstates the significance of the testing. (See Weger Decl. ¶ 15.) The report does not conclude that the post-treatment water is at risk for contamination by bacteria or parasites. It therefore does not raise an issue of fact as to whether the drinking water exposed Plaintiff to Giardia or H. pylori.

In addition, to address the conditions described in the study, Green Haven is taking precautionary measures by installing fiber

28

filters to the drinking water treatment plant. (See Weger Decl. ¶ 15.) The filters control against the risk of "particulate matter," rather than bacteria. (See id.) The DOH has not notified Green Haven that "the project is of an emergency nature." (See id.) Rather than "refus[ing] to remedy" the identified risks (which do not pertain to bacterial contamination), Green Haven is taking concrete steps to control them. See LaBounty, 137 F.3d at 73. In sum, the Earth Tech report provides no basis for a reasonable jury to conclude that anyone at Green Haven knew of, and ignored, the risk of biological contaminants in the drinking water.

The remaining materials offered by Plaintiff provide no competent evidence of any contamination of the facility's drinking water.[6] First, the fact that Plaintiff tested positive for H. pylori in 2003 (see Schulman Decl. Ex. F at 444), the allegations from Plaintiff's 2003 letter to McGrane that other inmates have been infected (see id. 448), and the claims in the 1997 letter that the water made other prisoners sick (see id. at 446), are not probative of any material probability of the presence of H. pylori or Giardia in the Green Haven water.

---

[6] For purposes of analysis, this Court will evaluate Plaintiff's submissions as though they are admissible and not subject to hearsay or other objections, without holding as such. In fact, other people's letters, describing still other people's alleged illnesses, would be excluded as pure hearsay if offered to prove that the water at Green Haven is or was contaminated. See Fed. R. Evid. 801(c).

29

As for H. pylori, human infection is "common," (see Chakravorty Decl. ¶ 7), such that "[i]n the United States, 30% of the adult population is infected" (Pl.'s Mem. Ex. 26). In Cherry v. Edwards, No. 01 Civ. 7886 (FM), 2005 WL 107095, at *1 (S.D.N.Y. Jan. 18, 2005), two plaintiffs alleged they had been exposed to H. pylori through the water supply at the prison where they were incarcerated. They submitted affidavits from six other prisoners claiming to have been infected. See id. at *8. The court also recognized that approximately a "dozen" cases had been documented in recent years. See id. However, noting the frequency of H. pylori infection in the general population, the court found the affidavits were "plainly insufficient to show that there was a greater than normal incidence of infection at [the facility] and, hence, some reason to believe that the water distribution system was fostering its spread." Id. That reasoning applies with even greater force in the instant case, where the only evidence of infection consists of Plaintiff's diagnosis and his reference to an unknown "number of [other] prisoners" with H. pylori, whom he does not name. (See Schulman Decl. Ex. F at 448.)

As for Giardia, its most common symptom is diarrhea, "a common symptom of many other maladies." (See Chakravorty Decl. ¶ 9.) Alleged instances of illness among other inmates do not provide a basis to reasonably conclude that the water at Green Haven carries that parasite.

30

Moreover, the July 1993 letter from McGrane refers to a waste water spill that occurred more than two years before Plaintiff arrived at Green Haven. (See Schulman Decl. Ex. F at 445; Defs.' 56.1 ¶ 9.) Moreover, it does not state that the spill affected drinking water at the facility. (See Schulman Decl. Ex. F at 445.) Plaintiff does not offer evidence to challenge Weger's assertion that the incident would not have affected the drinking water supply, which was located "upstream" from the waste treatment facility. (See Weger Decl. ¶ 12.) Similarly, Plaintiff provides no basis for questioning Weger's conclusion that only a "remote" risk of a negative impact on drinking water could have resulted from the August, 2001 dishwasher leak. (See Weger Decl. ¶ 13 & Ex. D.)

Finally, scattered complaints about discoloration and odor, reflected in correspondence, are not evidence of a material risk that inmates have been or will be exposed to H. pylori or Giardia. See Cherry, 2005 WL 107095, at *1, 3 (granting summary judgment to defendants on a contaminated water exposure claim, despite complaints about a "smelly odor" and discoloration during the time period in question).

As a whole, Plaintiff's submissions fail to undermine or sufficiently rebut Defendants' evidence of compliance with sanitary standards so as to create an issue of fact about H. pylori or Giardia in Green Haven's water. See Thomas v. New York State Dep't

31

of Correctional Servs., No. 00 Civ. 7163 (NRB), 2006 WL 435718, at
*6 (S.D.N.Y. Feb. 23, 2006) (granting summary judgment where
plaintiff failed to rebut evidence that his "current injuries" were
"not caused by . . . exposure" to the conditions he alleged).  The
record would not permit a reasonable jury to conclude that Green
Haven's water was actually contaminated.  Nor would it warrant a
finding that any DOCS official was deliberately indifferent to such
a risk.  Rather, the record indicates that DOCS officials have
taken measures to assure that the Green Haven water supply is
uncontaminated, and that they have reason to believe their efforts
have been successful, judging by records establishing compliance
with sanitary standards pursuant to oversight by the DOH.
Plaintiff thus raises no issue of fact as to the subjective or
objective elements of an Eighth Amendment claim.

Plaintiff cites the decision in LaBounty in support of his
allegations.  See 137 F.3d at 68.  Though its facts are pertinent,
that case does not alter the Court's conclusions.  In LaBounty, the
plaintiff claimed he had been exposed to chemical-laden water and
airborne asbestos in the prison where he was incarcerated.  See id.
at 70.  The Second Circuit reversed a grant of summary judgment for
the defendants on both claims.  See id. at 72-73.  On the water
contamination claim, it ruled in favor of the plaintiff because an
alleged pretrial discovery violation may have deprived him of
relevant evidence.  See id. at 72 (remanding with instructions to

"determine whether [the plaintiff] has been given copies" of relevant documents). Here, Plaintiff makes no allegation that relevant materials have been withheld.

On the asbestos exposure claim in LaBounty, there was no dispute that pipe insulation inside the facility contained asbestos. See id. at 73 ("The [d]efendants acknowledge that the pipes . . . are lined with asbestos."). The defendants represented that no asbestos particles actually entered the air, but admitted the pipe covering could become damaged and that "some asbestos may be exposed." Id. They contended that "[s]uch damage . . . is quickly repaired," and that the prison was "routinely inspected and has not been cited for any asbestos-related violations." Id. In holding that an issue of material fact existed as to the risk of asbestos exposure, the Court of Appeals emphasized that the defendants "failed to produce to the court any reports of inspections of the facilities." Id.

Unlike the defendants in LaBounty, Defendants here do not concede the presence of the contaminants in question. See id. Instead, it is Defendants' position that no bacteria or parasites at all are present in the treated water. (See Defs.' 56.1 ¶¶ 13, 15-16, 18-19.) Defendants also substantiate the claim of regulatory compliance with testing data and reports, whereas the defendants in LaBounty did not. (See Weger Decl. Exs. A-B.)

33

<u>LaBounty</u> thus does not offer a persuasive analogy to the present case, and provides no basis to deny summary judgment to Defendants.

For the reasons set forth above, each Defendant making the Motion is entitled to summary judgment on Plaintiff's contaminated water claims.[7]

## IV. Legal Standards for Deficient Medical Care Claims

When a prisoner alleges inadequate medical care, he must prove "deliberate indifference" to a "serious medical need." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976); <u>accord</u> <u>Hernandez</u>, 341 F.3d at 144; <u>Smith v. Carpenter</u>, 316 F.3d 178, 183-

---

[7] The Court also notes that there is no indication in the record that any Defendant was "personal[ly] involve[d]" in activities related to Plaintiff's alleged exposure to H. pylori or Giardia, which would be a "prerequisite to an award of damages under § 1983." <u>See Williams v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986) (quoting <u>McKinnon v. Patterson</u>, 568 F.2d 930, 934 (2d Cir. 1977)). Plaintiff does offer bare allegations suggesting that Defendants may be liable as supervisory officials, <u>see Hernandez</u>, 341 F.3d at 144-45 (explaining grounds for supervisory liability), because they failed to do "anything to stop or fix Plaintiff's situation," and "fail[ed] to oversee the people who caused the wrong" (<u>see</u> Pl.'s Mem. at 29). Yet, as explained above, he raises no material issue of any constitutional violation. Therefore, even if Plaintiff could show that each Defendant played an actual role, for instance, in overseeing personnel responsible for water quality at Green Haven, there could be no issue of supervisory liability. A defendant's negligent supervision, failure to take corrective measures, or other supervisory lapse is "immaterial" without any underlying "violat[ion of a] plaintiff's constitutional rights." <u>See Ramos v. Artuz</u>, No. 00 Civ. 0149 (LTS), 2003 WL 342347, at *11 (S.D.N.Y. Feb. 14, 2003) (granting summary judgment to a doctor on supervisory liability claim because doctor's subordinate had committed no constitutional violation).

34

84 (2d Cir. 2003); Harrison v. Barkley, 219 F.3d 132, 136-37 (2d Cir. 2000); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). Under the objective prong of this standard, the prisoner's medical condition must be "sufficiently serious." Wilson, 501 U.S. at 298, 111 S. Ct. at 2324; accord Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). Factors that are relevant in determining whether a serious medical condition exists include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Chance, 143 F.3d at 702 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992)); see also Smith, 316 F.3d at 187 ("[A] serious medical need exists where the failure to treat a prisoner's injury could result in further significant injury or the unnecessary and wanton infliction of pain.") (internal quotation marks omitted). Trivial or insignificant conditions do not fall within the scope of Eighth Amendment protection. Rather, the Eighth Amendment "contemplates a condition of urgency that may result in degeneration or extreme pain." Chance, 143 F.3d at 702 (internal quotation marks omitted). However, an inmate need not "demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor . . . that

his or her condition will degenerate into a life threatening one."
Brock v. Wright, 315 F.3d 158, 163 (2d Cir. 2003).

To prove that a charged official acted with the requisite "deliberate indifference," a prisoner must show more than negligence, but less than conduct undertaken for the very purpose of causing harm. See Farmer, 511 U.S. at 835, 114 S. Ct. at 1978; Hernandez, 341 F.3d at 144; Hathaway, 37 F.3d at 66. A prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S. Ct. at 1979.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not constitute deliberate indifference. See Chance, 143 F.3d at 703; Cherry, 2005 WL 107095, at *8; Veloz v. New York, 339 F. Supp. 2d 505, 521 (S.D.N.Y. 2004). Nor can deliberate indifference be established simply because an inmate "might prefer a different treatment," or feels that he did not get the level of medical attention he desired. Chance, 143 F.3d at 703; see Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986); Cherry, 2005 WL 107095, at *8.

Finally, simple negligence, even if it amounts to medical malpractice, is insufficient to establish deliberate indifference,

or any constitutional deprivation. See Estelle, 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation simply because the victim is a prisoner."); Hernandez, 341 F.3d at 144 ("A showing of medical malpractice is . . . insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm.") (internal quotation marks omitted).

## V.  Application to Plaintiff's Inadequate Medical Care Claims

At the outset, there is a substantial question about whether Plaintiff's ailments are "serious medical conditions."[8] However, the Court is prepared to assume, for purposes of analysis, that Plaintiff's acid reflux disease and H. pylori infection satisfy the objective component of an Eighth Amendment claim. He nevertheless falls short on the subjective component. Plaintiff presents no evidence of deliberate indifference to his conditions, on the part of either his medical providers or other DOCS officials.

---

[8] The testing Plaintiff has received indicates that he suffers from acid reflux disease and intermittent heartburn, and not any more serious condition. (See Med. at 69, 72, 95-96.) Chakravorty, Plaintiff's doctor, states that his condition "appears to be managed with medication." (See Chakravorty Decl. ¶ 34.)

37

A.   Failure to Timely Diagnose H. Pylori Infection

Plaintiff asserts that because Chakravorty performed "no proper investigation or testing[]" of his symptoms, diagnosis and treatment of his H. pylori infection were unduly delayed. (See Pl.'s Mem. at 18.) Even if this were true, Chakravorty would not necessarily be liable. A "delay in treatment based on a bad diagnosis" may only amount to "mere malpractice of medicine in prison." Harrison, 219 F.3d at 139. Regardless, Plaintiff offers no evidence that his medical providers failed to diagnose and treat his infection within an appropriate timeframe. Prior to 2002, Plaintiff complained only "occasionally" of heartburn, for which he was given Maalox. (See Chakravorty Decl. ¶ 13; see, e.g., Med. at 298, 373.) Chakravorty decided to "rule out" GERD on May 14, 2002, the day of Plaintiff's first documented complaint of regurgitation. (See Med. at 235; Chakravorty Decl. ¶ 14.) At Chakravorty's request, within several weeks Plaintiff saw a specialist, who diagnosed Plaintiff with GERD, but did not note any suspicion about H. pylori in Plaintiff's medical files. (See Med. at 95-98, 235.) On March 27, 2003, upon Plaintiff's first complaint following an attempt to control his reflux symptoms with increased medication, Chakravorty ordered an H. pylori test. (See Chakravorty Decl. ¶ 18.) The result came back positive on April 7 (see Med. at 128), Chakravorty prescribed antibiotics on April 8 (see id. at 219), and Plaintiff tested negative for H. pylori on June 4 (see id. at 126).

The facts in Liscio v. Warren, 901 F.2d 274 (2d Cir. 1990), in which the Second Circuit reversed summary judgment in favor of a defendant physician on an Eighth Amendment claim, provide a relevant comparison. The plaintiff in Liscio asserted that the doctor failed to diagnose him with alcohol withdrawal upon his admission to a correctional center. See id. at 275, 277. Evidence showed the doctor had read the plaintiff's file, where a nurse had noted he was a "poor historian" of his own condition. See id. Consequently, the doctor "was on notice that [the plaintiff] might be suffering from ailments other than" heroin withdrawal, which was the only thing he "mentioned when first booked." Id. at 276. The court found the doctor "also was on notice that the particular ailment might be alcohol withdrawal" because of evidence about symptoms particular to that condition. Id. "[D]elirium and bizarre behavior," the court explained, "are commonly associated with alcohol withdrawal and not with simple heroin withdrawal." Id. at 276-77. For those reasons, the court held that "a jury could find that [the defendant's] failure to diagnose [the plaintiff's] alcohol withdrawal constituted deliberate indifference." Id. at 277.

Here, Plaintiff does not dispute the sufficiency of information that Chakravorty used to diagnose and treat him at any time during his incarceration. Furthermore, unlike the plaintiff in Liscio, Plaintiff did not exhibit symptoms "commonly associated"

39

with H. pylori "and not" other ailments prior to his diagnosis in 2003. See id. at 276-77. Symptoms of H. pylori infection "are similar to those of other digestive maladies," according to Chakravorty. (Chakravorty Decl. ¶ 7.) Thus, even assuming Plaintiff was infected with H. pylori as of 1999, when Chakravorty began treating him, Plaintiff's complaints of "heartburn" and acid reflux would not have pointed only to the "particular ailment" of H. pylori infection. (See Med. at 298, 373.) Even the GI specialist did not order testing for H. pylori on the basis of those symptoms. (See Med. at 95-98, 235.) Moreover, Plaintiff continued to complain of acid reflux even after his H. pylori infection had been eradicated. (See Chakravorty Decl. ¶ 26.)

The evidence in this case thus raises no issue of material fact as to any delay by Chakravorty in diagnosing Plaintiff's infection that would amount to deliberate indifference.

B.  Improper Diagnosis and Treatment of Plaintiff's Digestive Disorder

Plaintiff asserts that he requires "more effective treatment" for his digestive maladies. (Pl.'s Mem. at 20.) According to Plaintiff, his medical providers have denied him "other treatment options," such as "[a]bdominal [s]urgery." (Pl.'s Mem. at 20, 35.) He also complains that he "may have developed stomach cancer." (Compl. ¶ 13.) The record, however, raises no issue of deliberate indifference in diagnosing Plaintiff with GERD and treating him accordingly. Plaintiff visited a GI specialist three times between

June, 2002 and May, 2003, leading to the GERD diagnosis and his antacid regimen. (See Med. at 89, 95-96, 98; Chakravorty Decl. ¶ 15-17, 21.) As part of Defendants' investigation of Plaintiff's ailments, he received an EGD exam, abdominal x-rays, and x-rays of his upper GI tract. (See Med. at 69, 72, 95-96.) The examination and test results did not show evidence of pharyngeal diverticula, lung hemorrhaging, stomach cancer, or other disorders Plaintiff suspected he may have. (See id. at 69, 72, 95-96; Pl.'s Mem. Ex. 10.) They support Chakravorty's conclusion that Plaintiff does not have "any condition subject to surgical repair." (See Chakravorty Decl. ¶ 33.)

Furthermore, medical records show Chakravorty was responsive when Plaintiff complained of acid reflux symptoms. He referred Plaintiff to a GI specialist in June 2002, leading to Plaintiff's GERD diagnosis. (See Med. at 235). He ordered testing for H. pylori in March 2003, and treated Plaintiff's infection upon discovery. (See id. at 126, 217, 219-20). He again referred Plaintiff to the GI clinic, in May 2003, and prescribed additional antacids. (See id. at 89, 217.) He granted Plaintiff's request for a different antacid prescription in February 2004 (see id. at 202-03), and prescribed antacids in February 2005 (See id. at 172), while considering testing to "rule out a return of GERD" (see Chakravorty Decl. ¶ 26). In short, there is no issue of material

fact as to whether Chakravorty could have been deliberately indifferent in caring for Plaintiff's GERD.

The fact that Plaintiff's medical providers did not always administer the treatment he requested does not alter this conclusion. In 2002, when Plaintiff requested that his EGD procedure be rescheduled for an earlier date, Koenigsmann responded that "the procedure is scheduled and will be performed soon." (See Pl.'s Mem. Ex. 6.) Plaintiff underwent the EGD on September 10, 2002, five days after Koenigsmann's letter. (See Med. at 95; Chakravorty Decl. ¶ 16.) In 2003, Koenigsmann also modified the GI specialist's recommended date for a follow-up with Plaintiff, allowing visits "as needed" rather than a set visit in four months. (See Med. at 89; Chakravorty Decl. ¶ 21.)

Setting the conditions and frequency of Plaintiff's access to specialized medical services in this way reflects Koenigsmann's "medical judgment," and is not actionable under the Eighth Amendment. See Estelle, 428 U.S. at 107, 97 S. Ct. at 292-93 ("[W]hether an X-ray or additional diagnostic techniques or forms of treatment [are] indicated is a classic example of a matter for medical judgment."); Stevens, 535 F. Supp. 2d at 386 (concluding that "medical judgment regarding the frequency of physical therapy . . . like the decision regarding referral to a muscular dystrophy specialist, falls into the category of disputes regarding choice of treatment, which do not provide the basis for a constitutional

claim"). "[D]isagreements over . . . diagnostic techniques . . . , forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a § 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d. 303, 313 (S.D.N.Y. 2001).

The same is true of whatever disagreements Plaintiff may have had with Chakravorty over his prescription for Prevacid in the fall of 2002. On one hand, he complains that Chakravorty "openly denied" his request for the full amount recommended by the GI specialist, 30 milligrams. (See Pl.'s Mem. at 20.) As Plaintiff's treating physician, Chakravorty started him at a lower dosage than the specialist recommended, apparently because of potential side effects of Prevacid. (See Chakravorty Decl. ¶ 17 (stating that Plaintiff was "advised of . . . side effects" of Prevacid).) This too qualifies as an exercise of "medical judgment," and does not give rise to a constitutional violation. See Messa v. LeClaire, No. 03 Civ. 1385, 2007 WL 2292975, at *6 n.8 (N.D.N.Y. Feb. 26, 2007) ("To the extent that [the plaintiff] contends that he should have been provided the pain medication recommended by the outside specialist, this claim must fail because mere disagreement over proper treatment does not create a constitutional claim as long as the treatment was adequate.").

On the other hand, Plaintiff complains that "no side effects [were] discussed" when Chakravorty increased the dosage to 30

milligrams, on Plaintiff's request. (See Pl.'s Mem. at 20; Med. at 225-26.)  Yet, Plaintiff does not claim that taking more Prevacid caused adverse side effects.  In fact, his 2003 grievance stated that the higher dosage "minimized the discomfort [of his d]isorder."  (See Schulman Decl. Ex. E at 420.)  Therefore, even assuming that an issue of fact exists about whether Chakravorty and Plaintiff discussed the side effects of Prevacid, it can create no basis for Eighth Amendment liability.

### C.  Claims Against DOCS Officials

"[P]ersonal involvement . . . in alleged constitutional violations is a prerequisite to an award of damages under § 1983." See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)).  Although only Chakravorty and Koenigsmann were directly involved in Plaintiff's medical care, he proposes, in conclusory fashion, that the remaining Defendants may be liable as supervisory officials. (See Pl.'s Mem. at 29.)  They failed to do "anything to stop or fix Plaintiff's situation," he claims, and "fail[ed] to oversee the people who caused the wrong."  (Id.)

However, supervisory liability under § 1983 "cannot rest on respondeat superior."  Hernandez, 341 F.3d at 144-45.  Rather, it requires participation in the alleged misconduct, whether by negligent supervision, failure to take adequate corrective measures when informed of constitutional violations, or some other lapse.

44

See Hernandez, 341 F.3d at 144-45.[9] The only conceivable evidence of such participation in the record pertains to Phillips and Haponik. Phillips was copied on Koenigsmann's September, 2002 letter to Plaintiff about the EGD. (See Pl.'s Mem. Ex. 6.) Haponik signed the denial of Plaintiff's 2005 grievance. (See Schulman Decl. Ex. F at 437.) There is no evidence that Goord or Wright received any complaints or reviewed any files related to Plaintiff's medical treatment.

Regardless, as explained above, Plaintiff cannot show deliberate indifference on the part of his medical providers. Therefore, the record raises no issue of fact as to whether any alleged supervisor should have prevented or corrected a constitutional violation. See Hernandez, 341 F.3d at 144-45; Ramos, 2003 WL 3422347, at *11. Because Chakravorty and Koenigsmann "did not violate [P]laintiff's constitutional rights," the DOCS Officials' alleged "failure, as . . . supervisor[s], to take corrective measures is necessarily immaterial." See Ramos v. Artuz, No. 00 Civ. 0149 (LTS), 2003 WL 342347, at *11 (S.D.N.Y.

---

[9] "The liability of a supervisor under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." Id. at 145.

45

Feb. 14, 2003) (granting summary judgment to a doctor on supervisory liability claim because doctor's subordinate had committed no constitutional violation). Each Defendant making the Motion is thus entitled to summary judgment on Plaintiff's medical care claims.

## VI. Defendants DOCS and McGrane

Two named Defendants, DOCS and McGrane, have not been served with process in this action. Moreover, it is clear that Plaintiff has asserted no viable claims against either. As a New York state agency, DOCS is immune from suit under the Eleventh Amendment. See Alabama v. Pugh, 438 U.S. 781, 781-82, 98 S. Ct. 3057, 3057-58 (1978) (per curiam) (holding that a suit for prospective injunctive relief against Alabama "and its Board of Corrections is barred by the Eleventh Amendment"); Davis v. New York, 316 F.3d 93, 101 (2d Cir. 2002) (holding claims against DOCS "barred by the Eleventh Amendment," where plaintiff sought declaratory and injunctive relief as well as damages). As for McGrane, the Complaint does not contain allegations about any act or omission on her part that violated Plaintiff's Eighth Amendment rights. The fact that, as an employee of the DOH in 2003, she wrote a letter responding to another inmate's complaint about Green Haven's water, creates no basis for liability to Plaintiff. (See Schulman Decl. Ex. F at 445.) Thus, there can be no grounds for relief against either DOCS or McGrane. The claims against DOCS and McGrane should therefore

46

be dismissed.[10] pursuant to the screening provision of 28 U.S.C. § 1915A.

## CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the moving Defendants be granted Summary Judgment on each of Plaintiff's claims, and that the Complaint be dismissed with prejudice as against them and Defendants DOCS and McGrane. Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. Failure to file objections will result in a waiver of those objections for purposes of appeal. See Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002); Spence v. Superintendent, 219 F.3d 162, 174 (2d Cir. 2000).

---

[10] Although neither McGrane nor DOCS has moved for dismissal, the Court may dismiss claims against them as facially deficient pursuant to the screening provision of 28 U.S.C. § 1915A because they have not yet been served with process.

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:   October 10, 2008
         New York, New York

Copies mailed this date to:

Troy Wright, 94-A-0337
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

Office of the Attorney General
Stephen N. Schulman, Assistant Attorney General
120 Broadway
New York, NY 10271